Now, let's see, you've decided that Mr. Levy will proceed first, and do you want the bailiff to keep track of your time? I would appreciate it. That would be very helpful. Mr. Levy, will you give Mr. Levy a red light at five minutes? Thank you very much. Good morning, your honors, and may it please the court. There was a clear error of law committed by the district court in granting summary judgment that no inequitable conduct occurred in the procurement of the patent suit in this case. The district court applied the wrong standard in assessing and determining materiality. District court applied the wrong standard in assessing and determining the issue of intent, and in granting summary judgment, the district court improperly resolved factual issues that were in the record and drew inferences improperly in favor of the money. Schmutz B is a lot closer to the claimed invention than Schmutz X, isn't it? Isn't anything beyond Schmutz B and Aurum really cumulative? Your honor, you've raised a number of questions there, and I wanted to get to the issues, and I appreciate that. And your honor, first of all, it's an issue of fact whether or not Schmutz B is closer to Schmutz X. It's, in fact, an issue of chemical fact. Well, for starters, that's what you put forward as your test for obviousness. You wanted obviousness over Schmutz B. Obviously, you thought it was closer, too. Well, your honor, but again, the question of closeness does not necessarily drive what is material and what is not material. The fact of whether or not one says it. But it does have a lot to do with what's cumulative and what isn't cumulative. Well, your honor, there was not an argument here raised of cumulativeness by the movement in this case. And the only, we have to go back to the record, your honor. They moved for summary judgment without the benefit of expert testimony. The only evidence in the record on the issue of the closeness of Schmutz B versus Schmutz X was the expert report of Dr. Prisanzano, in which he pointed out in his expert opinion that in fact that was not the case. And so the issue of what in fact was the closest prior art is a clear issue of fact that remains in the record, remains unresolved. The examiner seemed to think it had what it needed. It was happy with Horum and Schmutz B, never requested more. Your honor, that's because the examiner was not aware of what more was out there. And more importantly, the examiner was misled to that point. You have to take a look at the totality of the prosecution history. They were faced with clear rejection of prima facie case of obviousness based upon a number of similar structures with similar side chains. In responding to that office action, let's focus for a moment, if we could, on the first office action. What applicants set forth to do in that case was establish the expectation of those skilled in the art. Not that it was unpredictable, but what the expectation was going to be. And the expectation they set for the examiner was that compounds in this structural class are expected to be typical. And the only way they could sustain that expectation is by not disclosing to the examiner their internal knowledge that other prior art compounds in this structural class were atypical. So when they provided data to the examiner to support the false expectation of typicality, they went through their files and they proffered only that data that showed typicality while not providing the examiner with the balance, with the other half of the record, that they have also tested other compounds and these other compounds were in fact atypical. I'm not sure what that has to do with Judge Rader's comment about B versus X. I mean, granted, you cite the case as we look at what a reasonable examiner would have done or should have done. But it seems to me 20 years later after three rejections to say, I mean, the examiner didn't say when they proposed, we don't have X, it's going to cost us some money to produce it, you ought to accept B because it's closer. It doesn't seem to me under reasonable examiner standard that that is questionable. If not, you're telling parties that they ought to, even if an examiner accepts what they offer and they think is reasonable, that they have to think about, well, I've got to give him more than he says he wants or needs because I might get challenged 20 years later. But in fact, Your Honor, that is, in a sense, that is what happened here. They did give the exam, well, first of all, the examiner asked for two things, Horum and Schmutz X, and they complied with 50% of that. They gave them Horum and then they gave them some, the examiner, something else. They didn't just- Something closer. Something better. But again, that is an issue of fact, but they also, you have to look at the entire picture of what they did. But if the examiner had thought that, no, I mean, if he were you, you probably would have said, well, no, we really want X and I don't care how much it's going to cost you if you want this patent. But the examiner decided that that was adequate to satisfy his needs and I don't understand how we're supposed to sit here and say that was an unreasonable decision that he made. But the case goes further than that, Your Honor. And I would submit that just given the examiner what he or she asked for, when you have knowledge of other material information, does not fully discharge your burden of candor. Well, they didn't have the information on X. You're not disputing that they would have had to do additional tests. You dispute maybe how much it would have cost them, but you don't dispute that that information was not readily available, do you? Based upon the record, there is no evidence that they had data per se on Schmutz X. However, Your Honor, there is evidence in the record that based upon testimony of one of the named inventors, they had an expectation that Schmutz X would, in fact, have been another atypical antipsychotic. The inventor, Dr. Migler, testified that this was the adjacent homologue of compound 24028, which is also in Schmutz. And they didn't synthesize Schmutz X because they expected it to behave, and I'm paraphrasing, they expected it to have the properties of 24028 or the adjacent, the methyl homologue. So, Your Honor, there wasn't- Are you sure that I understand what you've just told us? Because I think that's very interesting. You're saying they had an obligation to create what might have been prior art against them, even though it didn't exist? No, Your Honor. What I'm submitting to the court is that they, remember, in response to the second office action, to Dr. Migler's declaration, they submitted Horum and Schmutz A and Schmutz B. So it wasn't just they said, we don't have Schmutz X because it would be too expensive to generate the data, and we submit that that was a material misrepresentation to the examiner based upon the record. But they went beyond that. They said, we're going to give you Schmutz B because we think it's closer. But then they also gave Schmutz A. And why would they give Schmutz A, which is another compound- No, but the stuff that you said, we're going to give you B because we think it's closer. There's no dispute that it was closer, right? No, again, Your Honor, on the record as it exists today on the expert testament, and the only evidence that they have on their side of the ledger on that point of closeness is attorney argument. The chemist on our side analyzed Schmutz X versus Schmutz B. And again, closeness is not just a function of my intimate, my, um- Yes, Your Honor, you're in your rebuttal time. Okay. Let me just- Finish your sentence. Closeness is not just a factor of chemical structure. It's not just a factor of looking at the figures. Closeness also has to do with function. And when they had knowledge of what the functionality of the compound was going to be, they had an obligation to disclose it merely beyond telling the examiner that if you look at the line drawings that this is closer on a structural basis. Okay. Thank you. Thank you, counsel Posado. Mr. Hofstadter? Your Honor, I will discard my prepared remarks and cut right to it. A couple points on closeness. First, as Mr. Levy said, there is- the only evidence is the opinion of Tebba's expert that in his view, Schmutz X would be- 24028 would be as close as Schmutz B. I've got the chemical schematics here in front of me. By simple observation, I can see that the side chain at the top of the Piper Zinnel is, in Schmutz B, much closer to chiatepine than it is in Schmutz X. Well, Your Honor, with respect, and this is again- one can look at it a couple different ways. One is that Schmutz X with the ethyl has no- goes further without a change. Once you get to Schmutz B, you have a change, you have a hydroxyl group there as opposed to chiatepine where the hydroxyl group is all the way at the end. That's the one point. And I don't want to, though, just focus on chemical structure. Also, I'm going to reiterate- But you'd have trouble with structure, wouldn't you? Because structurally, by mere observation, Schmutz B is closer. I would admit that- And you'd have trouble because you yourself made that observation when you used it as the basis for your obviousness claim, right? I don't believe our obviousness claim focused on- You started with Schmutz B, and you made your modifications, your combinations off of that. I believe that was Teva, Your Honor. Okay. Excuse me if I'm branding you with your co-defendant's position here. With respect to chemical structure, I will concede that it would be a disputed issue of fact at trial, which would be closer chemically. But we have two other issues with respect to closeness. One is that, in a pappish sense, closest is not only the structure, but it's also the function. Another point is that- These are all anti-psychotics, aren't they? These are all anti-psychotics, aren't they? Well, of course, Schmutz A wasn't an anti-psychotic. But when we're talking about the function and the purpose, we're talking about it as an atypical, not merely as having anti-psychotic activity, but also without the side effects. So looking at it that way, the closest compound in the sense of the function, both the chemical structure and the function, was 2,4 of 2,8. Because like cortiopine, it was both atypically- It was atypical. It was active and non-dyskinetic. What's bothering me about this, though, is that the examiner sitting there at the time decided or concluded, having rejected this application three times previously, that this would be an adequate substitute. And we don't know. If he had said, well, no, I'm not sure, the closeness matters, blah, blah, blah, he could have asked them to do X, and they might well have done X. So that's what's bothering me about this. With respect, Your Honor, the examiner- A, we don't know whether the examiner accepted that substitution. He was given Schmutz B earlier in response to the first office action. Well, the district court says the examiner accepted the substitution and allowed the claims. Is there any reason for us not to accept what the district court is saying? Yes, Your Honor. I'm sorry. Because the prosecution history doesn't support that. Schmutz B was identified to the examiner in response to the first office action, and the examiner in his rejection reiterated, the closest prior art is Schmutz X. So then the question is, all right, then why did the examiner allow the claims after the second office action? It was the third office action, right? I think it was after the second office action, Your Honor. But remember, the Migler Declaration and the arguments that went with it made an assertion. They provided data that bookended Schmutz X, both the Schmutz B, the ethyl hydroxy, and the methyl, and they asserted that this evidence is dispositive of the issue of whether compounds structurally resembling quetiapine would be both active and non-miskinetic. So now the examiner is faced with a sworn declaration asserting a general proposition. And so for him to reject the claim at that point would have been difficult, because then without evidence, he really would have been in a difficult position to disagree with that sworn assertion, unless he had been given the data on E24 or 28. If he had been given the data on E24 or 28, he would have had the proof that a compound exemplified in Schmutz was, in fact, active and non-miskinetic. And remember, too, with respect to the rejection based on Schmutz, which was beginning with Schmutz and then sending a reference to Foucher, Foucher taught the interchangeability of methyl and ethyl with the side chain of quetiapine. So in the context of the rejection, E24 or 28 was just as close as Schmutz X, and was, in fact, closer, or just as close as Schmutz B. Mr. Hochstetler, given that we're in such a quandary here over just materiality, how would there ever be a case for intent? Well, there's several points, but let's start with Schmutz A, Your Honor. If you take Aster's statement that all we gave would likely be the closest compound, what is Schmutz A doing? Schmutz A is not responsive to the examiner's request. The examiner only asked for evidence of a lack of side effects. It is not responsive to the prima facie case based on Schmutz, because the prima facie case based on Schmutz started with the three-ring structure. And there's no explanation by anybody as to what Schmutz A is doing. If Schmutz A wasn't there, Your Honor, and there's other evidence of an intent to see as well, it's not. Yes, you've exhausted your primary time. Finish your sentence if you're in the middle of it. I think I'd better save every second I can. OK. Thank you, Mr. Hochstetler. Thank you. Mr. Rank. May it please the court. Let me answer Your Honor's questions with respect to Schmutz B being closer to Schmutz X. Your Honor looked at the side chain link structure. It's clear, Isabel, we assert as you go. They're saying that's just structure. If you factor in the atypicality, you should have disclosed A, they say. The examiner was only interested in structure. He made structural obviousness rejections only, saying it would have been obvious to change this structure to this structure. But moreover, that's not all there is in the record. As this court has recognized a moment ago, the applicant said, we think B is closer to the next. The examiner must have agreed. He allowed the claims. He could have, as was his legal responsibility, if he continued to believe that X was closer, he would have insisted and should have insisted. Legally, he is required to do that, irrespective of how expensive it would have been for the applicant to make X. As Your Honors also recognize, Teva relied on B, not X, in their now-abandoned obviousness defense. There is something that troubles me here. The district court ruled on this motion before the close of discovery. Conceivably, if they'd had a chance to fully examine the facts, maybe they'd have found that toxicity killed the monkey or something else that would affect this case more significantly. Any problem there? None, Your Honor. Examiners, that's an FDA issue, frankly. Examiners are not concerned with toxicity. Toxicity doesn't affect patentability. Well, it's a pretty significant side effect. I agree with that, but it's unrelated to patentability. On this record, there is no clear and convincing evidence that this compound was toxic. In fact, the evidence is to the contrary. That's just a hypothetical, the point being that with discovery, we might not be debating whether or not some of these things are in the record or not. Well, appellants had full opportunity to take that discovery. But it was cut off early. That's the point. There was some expert discovery remaining. This motion is ruled on before the discovery finishes. Before the expert discovery finished, that's correct. The judge viewed that there were no genuine disputes of material fact. In other words, he concluded that no reasonable jury could find that Teva or Sandoz had established materiality or intent by clear and convincing evidence. That is still the case in our view. One of the things that seems to trouble me a bit is that it seems to me, would you agree that if the examiner had data showing that Schmutz X was atypical, you would have had a problem getting this patent? Perhaps. I will concede that. The other side suggests that you all had some internal data or some indication that testing Schmutz X would have revealed that. There is no dispute that there was no data on Schmutz X. The testimony of the inventor, Dr. Warawa, was to the effect not that he was afraid to make it and find out. His testimony was that he thought it would act just like the methyl compound, 24028, which he found to act through metabolite, which was dyskinetic. That was the testimony. It's not that he feared it would be atypical. In fact, in this case, Teva is a stop to contest the unexpected nature of atypical anti-psychotic research. Sandos conceded that issue when it abandoned its obviousness case. Under these circumstances, even if only one of the closest compounds had proven to be typical, that is, it caused dyskinetic reactions, that would have made the knowledge on the other more remote structural compounds irrelevant to patentability. In other words, the information would have confirmed and reinforced the patentability of quetiapine because the closest compounds were not atypical like quetiapine was. On intent, let me say a few words about intent. It is clear that appellants rely principally on the asserted high materiality to support their inference of intent. There is no materiality here for at least three reasons, much less a high materiality. The information on the four compounds was not inconsistent with the narrow patentability arguments presented to the court. Secondly, let's assume that contrary to fact, those four compounds were in fact atypical. Disclosing them would have reinforced the unpredictability and unexpected nature of the invention. Why? Why? Because the closest compounds, which matter for patentability under in-ray merchant, were not atypical. It just would have reinforced the patentability. Thirdly, this examiner clearly was not interested in any compounds structurally more remote than the ones that were closest, nor would any reasonable examiner have been under merchant. Under merchant says when you present comparative tests to establish patentability, you're only required to test those compounds which are closest to the ones you are claiming. Examiner Birch, fully aware of all four compounds, picked other compounds. Moreover, he knew that Perlopine was antipsychotic. He knew that's in the Schmutz 1 patent. He knew that fluperlopine was reported to be an atypical compound. That's in the Hunziker patent, which was the subject of the motion this past week. He knew the structures of all those compounds, yet he did not pick any of those four compounds as being closest. He did the job he was supposed to do. He focused on the closest prior art under merchant. Although he didn't cite it, he followed that law and said, show me that the closest compounds do not share quetiapine's atypicality. That's exactly what applicants did. The submission of Schmutz A, for example, didn't detract from the showing with respect to the closest compounds. The attorney explained why Schmutz A was being presented because it was in the same list with Schmutz X. Moreover, it wasn't it, Schmutz A was never tested for dyskinesia potential. The suggestion that Schmutz A data was presented to bolster the argument that structurally related compounds were not atypical fails because it was never tested for atypicality. This court in the recent decision of Star Scientific took the view that an inference of intent can only be made when it's the single most reasonable inference that can be made. I submit that that is far from being the case here. And in fact, when one looks at the declaration of Dr. Migler that was submitted in response to some other case law that says that inference is less compelling when you have significant materiality issues and you can get by with a much easier inference. Well it is a, there is a sliding scale between the two. The court here never reached the balancing because the court, in our view, properly found that there was no materiality, much less high materiality, and that there was no. But the difficulty is, and I'm sure we're all, possibly we're all sharing it, is that you're talking about inferences. So when Star says that if there's a reasonable inference, but the, it seems that the standard for summary judgment seems somewhat different with respect to inferences, does it not? No, it's the same standard. The inferences have to be drawn in the favor of the non-movement where they are reasonable. The argument asserted by appellants that applicants here made this broad general argument versus all structurally similar compounds was simply not made. The focus in the patent office was narrow with respect to the closest prior art compounds. The declaration was not submitted for the purpose of showing that other compounds were atypical. It was submitted for the purpose of showing that the closest prior art compounds were in the syntax case, which found no materiality for that same reason. Unless your honors have other questions. Can I just ask you a little technical question on the, there's markings of confidentiality in both briefs. Yes. It seems to me, I couldn't, it wasn't entirely clear to me the basis for those and it seems to me that maybe even references were made today that might have gone there. Are we supposed to adhere to those? Well we, perhaps out of an abundance of caution, our client's confidential information produced under the terms of a protective order in the court below were maintained in this court as confidential. Hence the reason for bracketing Esther Zeneca's internal confidential information. They were quite broad. But I think that we would appreciate it if both of you would take a second look at your markings of confidentiality. It does make presenting our opinion more complex. We will do so, your honor. If you would both do so, perhaps refile your briefs with highlighting what you really need to be preserved as confidential. Would be helpful. Thank you for mentioning that. We will undertake to do that. Okay. Thank you, Mr. Mayor. Thank you. Mr. Levy. Thank you, your honor. And let me note that none of the confidential information is Tavis, so we will defer entirely to Esther Zeneca on that point. In the two or so minutes that I have, let me just try to bring out to the court in fact what took place here during the course of this prosecution, take a step back. Counsel cited to the In Re Merchant case. In Re Merchant also notes that while particular results appear unexpected in comparison with the closest single prior art reference, the teaching of another reference may establish that those results have been expected by those skilled in the art. What counsel did in responding to the questions of this court is attempt to merge the concepts of predictability and expectation. In order for something to be unexpected in order to rebut a prima facie case of obviousness, you have to understand and know what the expectation of the art is. And let's take a very quick look, if we can, in the four seconds that I have remaining, as to what the expectation was and how they created that expectation. And my time is up, but very quickly, thank you, Your Honor, I appreciate that. In response to the first office action, they were faced four principal references, Horum, Schmutz, 21076, Research Disclosure Act, and Fouché. In response to Schmutz, they said, we've tested one compound of Schmutz and it is typical, and nothing in here teaches atypicality. In response to Horum, they said, we've tested one compound of Horum, and that is typical. And with regard to 21076, which was a German language publication, which they gave in abstract, they said, it does not claim it is typical. They made an affirmative misrepresentation that it does not state that it is typical. That was an affirmative misleading representation. And so what they did was, and with Fouché, they said that it argued with your statement that that was incorrect, you recall? Well, Your Honor, I don't believe that they take an issue with that fact, because again, it never says that it is typical. What they said is that atypicality would have been so surprising that if they had discovered it, it wouldn't have been, it would have been in there. So its absence is an affirmative statement that it is typical. And Your Honor, candidly, what they did was they took every reference that was in front of the examiner, and they said, typical, typical, typical. It's not a surprise that 21076 did not get carried over to the next office action. There were two office actions, Your Honor, not three. Did not get carried over to the next office action by simple virtue of the fact that they told him it says it is typical. It's not surprising. They gave him the answer. And again, I know that I'm well into exceeding my rebuttal time. Okay, thank you, Mr. Levy. Mr. Holstead. Your Honor, as with Tevod, all of the redactions for confidentiality are due to ASTRA's brief. So whatever they want to do with respect to that is fine with us. ASTRA said that Schmutzay's data was not supportive when they submitted it. In effect, saying the Schmutzay data was submitted apparently to be ignored, but his assertion is inconsistent with the Migler Declaration, which said that the data showed that compounds, which could be predicted to be active, would not also be atypical. The data on Schmutzay showed that it was not active. ASTRA has no explanation for why the data on Schmutzay was provided. And the data on the best compound, what is undoubtedly the best compound, U24 or 28, that was shown in Schmutz, was not given to the examiner. I believe my time is up. Okay, thank you, Mr. Holstead. Any more questions for the judge? Thank you all.